# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| FACCHINA CONSTRUCTION LITIGATIONS | C.A. No. N17C-09-163 PRW CCLD CONSOLIDATED |

Submitted: July 2, 2020
Decided: October 29, 2020

## DECISION AFTER TRIAL

Stephen B. Brauerman, Esquire, Elizabeth A. Powers, Esquire, BAYARD, P.A., Wilmington, Delaware; Robert Mahoney, Esquire, Saleem Mawji, Esquire, NORRIS MCLAUGHLIN, P.A., Bridgewater, New Jersey, *Attorneys for Plaintiff Paul V. Facchina, Sr.*

Kelly A. Green, Esquire, Jennifer M. Rutter, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Jeffrey Gans, Esquire, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, DC, *Attorneys for ICA Tech and Empresas ICA.*

Joelle E. Polesky, Esquire, STRADLEY RONON STEVENS & YOUNG, LLP, Wilmington, Delaware; Timothy E. Heffernan, Esquire, Jonathan R. Wright, Esquire, WATT TIEDER HOFFAR & FITZGERALD, L.L.P., McLean, Virginia, *Attorneys for Plaintiff Facchina Construction Company, Inc.*

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

This consolidated action consists of two lawsuits arising out of the purchase of various construction businesses (the "Facchina Companies"), including Facchina Construction Company, Inc. ("Facchina Construction Company" or "FCCI") and Facchina Construction of Florida, LLC. On June 28, 2013, Paul V. Facchina, Sr.

-1-

("Mr. Facchina" or "Seller Representative") acting on his own behalf and for entities created or owned by him (collectively, the "Sellers"), and ICA Tech Corporation ("ICA Tech") entered into a Purchase and Sale Agreement ("PSA"). ICA Tech's parent, Empresas ICA ("Empresas" and together with ICA Tech, "ICA Tech/Empresas"), was a party to the PSA as a guarantor.

In mid-September 2017, Mr. Facchina filed suit against ICA Tech and Empresas, seeking a declaration that ICA Tech/Empresas owe the Sellers an Acceleration Payment of $30,647,509 and that certain escrow funds plus earnings thereon should be released to him as part of that payment. Under the PSA, Sellers were granted a contingent right to receive future payments from FCCI based on the annual financial performance of the Facchina Companies over a three- to five-year period ("Earn-Out Payments"). Empresas guaranteed FCCI's obligations in this regard. The right to these Earn-Out Payments by FCCI could be accelerated if ICA Tech sold "all or substantially all of the assets" of the [Facchina] Companies, taken as a whole as they then currently existed, to an unaffiliated Third Party Purchaser and such Third Party Purchaser did not "assume or guaranty" the Sellers' Earn-Out rights.[1]

---

[1] PSA § 1.8(a), (e), p. 7, 10-11 (JX-27).

Mr. Facchina alleges the subject June 2013 PSA projected that he would earn $35-40 million over the ensuing three to five years.[2] This figure represents about 40% of the consideration Mr. Facchina would receive from the sale.[3] Additionally, ICA Tech would fund a $3.5 million escrow account with Wells Fargo for "payment of any outstanding indemnifications claims."[4] Both Mr. Facchina and ICA Tech now want those escrow funds. But Wells Fargo will not release them without a court judgment or the parties' consent.[5] An additional $2.25 million was withheld "as part of the final working capital adjustments from the cash that [Mr. Facchina] received at closing" to act as a reserve to indemnify a potential outstanding claim incurred by the Facchina Companies.[6]

Mr. Facchina alleges that ICA Tech has only paid $4,352,491 of these amounts, of which $3.5 million went to escrow and $852,491 went to Mr. Facchina.[7] Mr. Facchina claims he contacted ICA Tech multiple times between 2015 and 2017 about the status of the Facchina Companies and the Earn-Out Payments but received

---

[2]   Seller Representative's Compl. (D.I. 1) at ¶ 1.

[3]   *Id.*

[4]   *Id.* at ¶¶ 2, 28.

[5]   *Id.* at ¶ 35.

[6]   *Id.* at ¶ 30.

[7]   *Id.* at ¶ 40–41.

no response.[8]  In turn, Mr. Facchina, as Seller Representative, demanded an Acceleration Payment of $30,647,509 by September 5, 2017.[9]  ICA Tech didn't respond to that request either.[10]

Instead, in October 2017, FCCI filed suit against Mr. Facchina and Facchina family members and trusts.  FCCI is seeking a money judgment against Sellers in the Adjusted Principal Amount of $6,814,303.08 plus costs, pre- and post-judgment interest, and attorney's fees arising from Seller's indemnification obligations under the PSA related to the "Silver Spring Matter" (Count I).  FCCI is also seeking a money judgment for prevailing party attorney's fees under PSA § 11.23 (Count II).  Additionally, FCCI is seeking a declaratory judgment that Sellers are not entitled to the $3.5 million held in escrow (the "Escrowed Funds"), which were earmarked as security for Sellers' indemnification obligations for the Silver Spring Matter (Count III).

In late October 2017, ICA Tech/Empresas answered and filed a counterclaim in Mr. Facchina's mid-September suit.  And in June 2018, ICA Tech/Empresas amended its counterclaim.  The amended counterclaim seeks the return of the $55 million ICA Tech paid for the Facchina Companies.  It says Mr. Facchina

[8]  *Id.* at ¶¶ 44–45.

[9]  *Id.* at ¶ 50.

[10]  *Id.* at ¶ 51.

fraudulently induced ICA Tech to buy the Facchina Companies by making false representations that concealed material adverse information about the Facchina Companies including the Grove at Grand Bay project ("Grove"). ICA Tech also contends that the escrowed $3.5 million plus earnings thereon should be released to ICA Tech. Finally, ICA Tech seeks punitive damages against Mr. Facchina personally, interest on the $55 million, and reimbursement of its reasonable attorney's fees and costs.

## II. THE TRIAL

The Court conducted a five-day bench trial and all parties submitted post-trial briefing and certain motions. The respective cases were deemed fully submitted for decision in July 2020.

During trial, the Court heard from and considered the testimony of the following witnesses:

Paul V. Facchina, Sr.

Dolores Laputka, Esquire

Jennifer Wade Carpenter (by deposition)

Patrick Wielinski[11]

---

[11] Mr. Facchina presented Wielinski as his expert witness on insurance coverage and policies. *See* Del. R. Evid. 702. The Court found Wielinski to be a credible witness. But FCCI objected to Wielinski's testimony, arguing that his opinions do not meet the standards for admissible expert testimony under Delaware law because it constitutes improper legal opinion on matters of law reserved for this Court. *See M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513 (Del. 1999) (adopting the federal *Daubert* holding and analysis for determining the admissibility of and use of expert testimony"). While the Court found Wielinski to be a credible witness and his testimony of assistance in certain regards, any testimony the Court considered to have crossed the line into

Leslie A. Nicholson

Rodrigo Quintana

Charles McPherson

Adrian Bastianelli, III, Esquire

Charles W. Langfitt

The parties also submitted an extensive number of exhibits, most of which were admitted without objection and are cited herein by their designations as joint exhibits.

## III. FINDINGS OF FACT

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law. So to the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[12]

### A. THE PARTIES

Mr. Facchina is a citizen of the State of Maryland. He is named in these actions individually, in his capacity as the Seller Representative under the PSA, and

---

improper legal opinion was simply disregarded by the Court during its deliberations. *E.g. Penn Mut. Life Ins. Co. v. Espinoza*, 70 F.Supp.3d 628, 635 (D. Del. 2014) (striking rebuttal expert testimony that offered improper legal opinion).

[12] *See FlowShare, LLC v. GeoResults, Inc.*, 2020 WL 1921019, at *2 (Del. Super. Ct. Apr. 2, 2020) (citing *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 367 (Del. 2009); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010); *Bay City, Inc. v. Williams*, 2 A.3d 1060, 1061–62 (Del. 2010)).

as Trustee for the Paul V. Facchina Revocable Trust organized under the Trust Agreement dated November 18, 1993 ("Facchina Revocable Trust").[13]

FCCI was formed by Mr. Facchina in 1987. FCCI is a corporation organized and existing under the laws of the State of Maryland with its principal place of business located in La Plata, Maryland.[14] FCCI provides a wide range of construction services.[15]

ICA Tech is a Florida-based subsidiary of Empresas, a Mexican based company.[16] Empresas is a Mexican corporation and is a parent of ICA Tech.

## B. RELEVANT PROVISIONS OF THE PSA

In June 2013, FCCI and ICA Tech entered into the PSA, whereby FCCI was sold to ICA Tech. Mr. Facchina was designated as the "Seller Representative" with the authority to act on behalf of the Seller.

The indemnity provision in § 9.9 of the PSA provides:

> Any settlement or compromise made or caused to be made by the Indemnified Person or the Indemnifying Person, as the case may be, of any such claim, suit, action or proceeding of the kind referred to in Section 9.8 shall also be binding upon the Indemnifying Person or the Indemnified Person, as the case may be, in the same manner as if a final judgment or decree had been entered by a court of competent jurisdiction in the amount of such

---

[13] Second Am. Joint Pretrial Stipulation and Order ("PTO") at ¶ 2 (D.I. 144).

[14] *Id.* at ¶ 1.

[15] Trial Tr., Nov. 18, 2019, at 14 (D.I. 145).

[16] Seller Representative's Compl. at ¶ 1.

settlement or compromise; provided, that . . . (ii) the Indemnified Person shall not compromise or settle any claim, suit, action or proceeding without the prior written consent of the Indemnifying Person, which such consent shall not be unreasonably withheld.[17]

In contrast, § 9.8 is a general catch-all provision for unspecified indemnity claims of which Sellers did not already have knowledge:

The Indemnified Person shall give notice as promptly as is reasonably practicable to the Indemnifying Person of the assertion of any claim (or the commencement of any suit, action or proceeding) by any unaffiliated Person not a party hereto (other than by a Governmental Authority with respect to Taxes, which shall be governed by Section 4.13(e)) in respect of which indemnity may be sought under this Agreement...[18]

Section 9.2(e) of the PSA details FCCI's Silver Spring Matter indemnity claims and general provisions. It states that

Each Seller, jointly and severally, agrees to indemnify, subject to the limitations of this Article IX, each of the Purchaser Indemnified Parties against, and agrees to hold each of them harmless from, any and all Losses incurred or suffered by them relating to or arising out of or in connection with any of the following:

. . .

(e) the Silver Spring Matter.[19]

---

[17]  PSA § 9.9, p. 77.

[18]  *Id.* § 9.8, p. 76.

[19]  *Id.* at § 9.2(e), p. 73.

The PSA is "a binding, valid, and enforceable agreement to which the Defendants are parties."[20] Each Seller in this Litigation is a "Seller," as defined in the PSA.[21] Sellers stipulated that "FCCI is a Purchaser Indemnified Party (as defined in the PSA)."[22] Therefore, the PSA requires the Sellers to indemnify FCCI for all "Losses incurred or suffered by them relating to or arising out of or in connection with . . . the Silver Spring Matter."[23]

Section 11.23 defines "Loss":

"Loss" or "Losses" shall mean any and all actual losses, liabilities, costs, claims, damages, penalties and expenses (including attorneys' fees and expenses and costs of investigation and litigation). In the event any of the foregoing are indemnifiable hereunder, the terms "Loss" and "Losses" shall include any and all reasonable attorneys' fees and expenses and costs of investigation and litigation incurred by the Indemnified Person in enforcing such indemnity.[24]

The definition of "Losses" includes the enumerated categories of damages in the first sentence, and the second sentence requires award of attorney's fees and costs of investigation where any one of the "Losses" in the first sentence arises.[25]

---

[20] FCCI's Statement of Facts Admitted at Trial ("FCCI's SOF") at ¶ 12 (D.I. 156).

[21] *Id.* at ¶ 13.

[22] *Id.* at ¶ 15.

[23] PSA § 9.2(e), p. 73.

[24] *Id.* at § 11.23, p. 101.

[25] FCCI's SOF at ¶ 19.

The definition of "Silver Spring Matter" consists of a predicate, three clauses specifying events that are expressly included in the definition, and a final section listing specific types of "Losses" for which Sellers must indemnify FCCI.[26] The predicate of the "Silver Spring Matter" definition includes, "[a]ll Proceedings and Liabilities . . . made, threatened or otherwise asserted or established by Foulger-Pratt Contracting, LLC . . . against [FCCI]. . . .":

> [A]ll Proceedings and Liabilities (including any tort, contract, statutory other claims) made, threatened or otherwise asserted or established by Foulger-Pratt Contracting, LLC, Montgomery County, Maryland or any of their respective successors, assigns, representatives, or Affiliates or any other Person claiming by, through or on behalf of any of them against the Companies, the Acquired Subsidiaries or any Purchaser Indemnified Party) [sic] with respect to, relating to or arising out of . . . .[27]

The PSA defines "Proceeding" as, "any litigation, action, suit, proceeding, charge, claim, complaint, demand, inquiry, investigation, audit, hearing, arbitration or Order."[28] The PSA defines "Liabilities" as "any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any time, whether accrued, absolute, contingent, matured, unmatured, liquidated, unliquidated, known or unknown."[29] FCCI is

---

[26]    *Id.* at ¶ 20.

[27]    PSA § 11.23, p. 106.

[28]    *Id.* at p. 104.

[29]    *Id.* at p. 101.

defined as a "Company" and a "Purchaser Indemnified Party" in the PSA.[30]

The term "Silver Spring Matter" includes the Silver Spring Transit Center ("SSTC") Lawsuit and any "Liabilities" arising from or related to the specified events in the following three clauses.[31] Clause (i) encompasses non-conforming work at the SSTC project ("SSTC Project"):

> (i) allegedly nonconforming concrete or other allegedly nonconforming or defective work at the Silver Spring Transit Center including matters identified in the KCE Report . . . .

Clause (ii) encompasses any breach of the subcontract between FCCI and Foulger-Pratt:

> (ii) any breach of or failure to perform the subcontract with Foulger-Pratt Contracting, LLC or any other contract or arrangement with Foulger-Pratt Contracting, LLC, Montgomery County, Maryland or any of their respective successors, assigns, representatives or Affiliates or any other Person claiming by, through or on behalf of any of them related to the Silver Spring Transit Center . . .[32]

Clause (iii) encompasses amounts contemplated by the Retention Agreement, Joint Defense Agreement, or similar agreements: "any amounts payable or reimbursable under the Retention Agreement or Joint Defense Agreement or any similar

---

[30] *Id.* at p. 1 (identifying the "Companies"); *id.* at p. 104 (definition of "Purchaser Indemnified Parties"); FCCI's SOF at ¶ 15 (FCCI is a Purchaser Indemnified Party).

[31] PSA § 11.23, p. 106.

[32] *Id.*

-11-

arrangement. . . ."[33]

The final portion of the definition of the "Silver Spring Matter" is a non-exhaustive list of the types of "Proceedings, Liabilities or Losses" specifically included in Sellers' indemnity obligations:

> including in each case, any Proceedings, Liabilities, or Losses related to delay of the project, repair or replacement of nonconforming work, any indemnification obligations and any legal fees, defense costs, consulting or other advisor fees, engineering, evaluation and design or investigation costs, liquidated damages, failure to collect on retentions, holdbacks or loan amounts or failure to collect any accounts receivable related thereto and any amounts owed to subcontractors with respect to, relating to, or arising out of any of the matters described in clause (i), (ii) or (iii) of this definition.[34]

FCCI suggests that claims arising under PSA 9.2(e) are different than general indemnify claims under the other general subsections and that the "Silver Spring Cap Amount" should be treated differently than the "General Cap Amount" in § 9.5.[35] Further, FCCI asserts that the parties intended the Silver Springs claims were not to be included in the general provisions and therefore did not require additional notice. FCCI also claims that even if it did breach § 9.9, it was not a material breach.[36]

---

[33] *Id.*

[34] *Id.*

[35] FCCI's Post-Trial Opening Br. at 6-7 (D.I. 154).

[36] *Id.*

## C. THE ESCROW AGREEMENT

Pursuant to the PSA, Purchaser entered into an escrow agreement ("Escrow Agreement") around July 2015 with Mr. Facchina, as Seller Representative, and the escrow agent, Wells Fargo N.A. Under the PSA, the first $3.5 million of any Earn-Out monies was to be placed in an Escrow Account with Wells Fargo, to pay third-party claims that might be asserted against the business arising from acts or omissions that occurred prior to closing.[37] Section 9.11 of the PSA details the Escrow Agreement and states:

> Purchaser shall deposit on behalf of Sellers, to the extent funds are available therefor, the amount of $3,500,000 in escrow, to be held and disbursed in accordance with the terms of the Silver Spring Indemnity Escrow Agreement (the "Escrowed Funds"), from the first dollars of the Earn-Out Payments… The Escrowed Funds shall be held as security and used for payment of Sellers' indemnification obligations with respect to claims made from time to time by the Purchaser Indemnified Parties in respect of the Silver Springs Matter or any other matter as provided in this Section 9.11 in accordance with the terms of the Silver Spring Indemnity Escrow Agreement.[38]

In August 2015, the Escrow Account was funded—all of the first $3.5 million of Earn-Out money having been transferred thereto and available for the Silver Spring Claim. That $3.5 million remains with Wells Fargo.[39]

---

[37] PTO at ¶ 38.

[38] PSA § 9.11, p. 77.

[39] Trial Tr., Nov. 18, 2019, at 201-02.

Section 9.11 of the PSA is clear that Sellers' indemnification obligations are not limited to the Escrowed Funds.[40] Rather, Sellers' indemnification obligations are limited to the "Base Purchase Price plus any Earn-Out Payments."[41] And where any Losses are caused by "fraud, intentional misrepresentation or any intentional breach of [the PSA]," there is no limit on Sellers' liability.[42]

## D. THE SILVER SPRING TRANSIT CENTER LITIGATION

On September 3, 2008, Montgomery County, Maryland ("MontCo") entered into a contract ("Prime Contract") with Foulger-Pratt Contracting, LLC for the construction of the Silver Spring Transit Center in Montgomery County, Maryland.[43] The SSTC Project was intended to be turned over to the Washington Metropolitan Area Transit Authority ("WMATA") to operate upon completion.[44] On December 5, 2008, Foulger-Pratt entered a subcontract ("Subcontract") with FCCI to serve as the concrete subcontractor on the SSTC Project.[45] In March 2018, Travelers

---

[40]  PSA § 9.11, p. 78 ("[T]he Escrowed Funds shall not be a limitation on Sellers' indemnification obligations with respect to any indemnification matter, including the Silver Spring Matter. . .").

[41]  *Id.* at § 9.5(b), p. 75 ("The Sellers' aggregate liability under this Agreement for indemnification shall not exceed the Base Purchase Price plus any Earn-Out Payments earned hereunder."); FCCI's SOF at ¶ 21.

[42]  PSA § 9.5(c), p. 75; FCCI's SOF ¶ 21.

[43]  FCCI's SOF at ¶ 5.

[44]  *Id.*

[45]  *Id.* at ¶ 6.

provided a performance bond on behalf of FCCI to ensure its performance on the SSTC Project. That bond remained in full force and effect for the entire contract period.[46] In approximately 2011, a dispute arose concerning alleged construction defects at the SSTC Project involving observed cracking of concrete and on the major structural decks.[47] In January 2012, FCCI and Foulger-Pratt entered into a Standstill and Joint Defense Agreement ("JDA") regarding the SSTC Project, including MontCo's allegations that certain portions of the work were defective and/or did not conform with the Prime Contract requirements.[48] Travelers paid FCCI's $5 million portion of the MontCo/Foulger-Pratt settlement on FCCI's behalf to settle the SSTC lawsuit, including Foulger-Pratt's claims against FCCI and its bond.[49] Travelers paid FCCI's portion of the WMATA settlement on FCCI's behalf to settle the SSTC lawsuit.[50] Also, during the SSTC lawsuit, Travelers paid FCCI's lawyers and FCCI's consultant.[51]

---

[46] *Id.* at ¶ 7.

[47] *Id.* at ¶ 8.

[48] *Id.* at ¶. 9.

[49] FCCI Post-Trial Opening Br. at 17; FCCI's SOF at ¶ 55-64.

[50] FCCI's SOF at ¶ 57.

[51] *Id.* at ¶¶ 74, 81.

FCCI is seeking indemnity from Sellers for "any and all Losses incurred or suffered [by FCCI] relating to or arising out of or in connection with . . . the Silver Spring Matter."[52] At PSA § 11.23 the "Silver Spring Matter" definition has categories of "Liabilities or Losses" that are indemnifiable thereunder:

> including in each case, any Proceedings, Liabilities or Losses relating to delay of the project . . . any indemnification obligations and any legal fees . . . consulting or other advisor fees . . . and any amounts owed to subcontractors with respect to, relating to, or arising out of any of the matters described in clause (i), (ii), or (iii) of this definition.[53]

That same definition's clause (i) encompasses non-conforming or defective work at the SSTC project; while clause (ii) encompasses any breach of the subcontract between FCCI and Foulger-Pratt; and, clause (iii) encompasses amounts contemplated by the Retention Agreement, Joint Defense Agreement or similar agreements.[54]

FCCI argues that Sellers refuse to indemnify it for "Losses" incurred in the SSTC lawsuit that include: (i) payments Travelers made on FCCI's behalf to settle the SSTC lawsuit and legal fees and consulting fees related to the SSTC lawsuit; and

---

[52] FCCI's Post-Trial Reply Br. at 3 (D.I. 165).

[53] PSA § 9.2(e), p. 73; PSA § 11.23, p. 106.

[54] PSA § 11.23, p. 106.

(ii) uncovered retainage and unrecovered claims for delays and pour strip work on the SSTC Project.[55]

ICA Tech asserts that after Travelers paid over $5.5 million in May 2017 to settle the liabilities faced under the bond issued to FCCI with respect to the Silver Spring Matter, Travelers demanded that ICA Tech obtain the $3.5 million that had been escrowed by Sellers to protect ICA Tech from liabilities related to the Silver Spring Matter.[56] ICA Tech says that because it was prohibited from obtaining the escrowed funds it was forced to settlement its overall liabilities to Travelers for $80 (rather than 76.5) million.[57]

As a party to the Escrow Agreement, on June 30, 2017, ICA Tech caused the Silver Spring Claim Statement to be sent to the Escrow Agent, Mr. Facchina, and Mr. Facchina's counsel demanding payment of $9,259,949.01 in "Losses" that FCCI sustained related to the Silver Spring Matter, and release of the Escrowed Funds as partial payment therefor.[58] The Silver Spring Claim Statement described FCCI's "Losses" as follows:

> [C]ertain actual losses, liabilities, costs, claims, damages and expenses
> (including certain attorneys' fees and expenses) that Facchina [FCCI]

---

[55] FCCI's SOF at ¶ 41(a)-(c).

[56] ICA Tech/Empresas's Post-Trial Opening Br. at 18-19 (D.I. 157).

[57] Id. at 19.

[58] FCCI's SOF at ¶ 91.

has incurred (including those that Facchina's bonding company, Travelers Casualty and Surety Company of America asserts that it has incurred on Facchina's behalf) in connection with the Silver Spring Matter . . .[59]

The Silver Spring Claim Statement specified the categories of damages for which indemnity was demanded.[60] Further demand for indemnity was made by FCCI through its bonding company, Travelers.[61] On July 11, 2017, Travelers sent a letter on behalf of FCCI demanding payment in the amount of $9,259,949.01 for "certain actual losses, liabilities, costs, claims, damages and expenses (including certain attorneys' fees and expenses) that [FCCI] and Travelers have incurred in connection with the Silver Spring Matter."[62] The July 11, 2017 Travelers letter identified the same eight categories of "Losses" under the PSA as in the Silver Spring Claim Statement.[63] Finally, FCCI's Complaint sought indemnification.[64]

Travelers paid FCCI's portion of the MontCo/Foulger-Pratt and WMATA settlements that FCCI asserted as claims for retainage, delay, and pour strips in the

---

[59]   JX-241 (Silver Spring Claim Statement) at 3.

[60]   *Id.* at 3-4.

[61]   FCCI's SOF at ¶ 92-93.

[62]   JX-243 (Travelers Demand Letter) at 2; FCCI's SOF at ¶ 93.

[63]   JX-243 at 2-3; JX-241 at 3; Trial Tr., Nov. 21, 2019, at 118-212; FCCI's SOF at ¶¶ 91, 93.

[64]   FCCI's SOF at ¶ 98.

SSTC lawsuit.[65] In response to the Silver Spring Claim Statement, Mr. Facchina sent an Objection Notice dated July 26, 2017 challenging FCCI's rights to indemnity and release of the Escrowed Funds.[66] Mr. Facchina admits that he objected to the Silver Spring Claim Statement. Mr. Facchina also refused to pay Travelers in response to Travelers' July 11, 2017 letter.[67]

Charles McPherson, FCCI's CEO, confirmed that FCCI never received payment for its affirmative claims in the SSTC lawsuit. Adrian Bastianelli, Esquire, of Peckar & Abramson ("Peckar"), FCCI's lawyer during the SSTC lawsuit, testified that Travelers paid his legal bills and those of David Anderson, FCCI's consultant in the SSTC lawsuit.[68] Charles Langfitt of Travelers testified that Travelers advanced funds on FCCI's behalf for the MontCo/Foulger-Pratt and WMATA settlements, Peckar's legal fees, and David Anderson's consulting fees.[69] And, Langfitt told the Court, Travelers has received no reimbursement for any of those.[70]

---

[65] Seller Representative's Compl. at ¶6; JX-239 (Travelers' wire transfer for $5,000,000 for MontCo/Foulger-Pratt settlement); *see also* FCCI's SOF at ¶¶ 50, 57.

[66] JX-246 (Mr. Facchina's July 26, 2017 Letter); FCCI's SOF at ¶ 96.

[67] *See* JX-247 (Mr. Facchina's July 27, 2017 Letter); FCCI's SOF at ¶ 97.

[68] Trial Tr., Nov. 20, 2019, at 18.

[69] Trial Tr., Nov. 21, 2019, at 106-30; JX-229 (Travelers $583,333.34 Wire Transfer to WMATA); *see also* FCCI's SOF at ¶50.

[70] Trial Tr., Nov. 21, 2019, at 131-32.

## E. THE CONCRETE WORK AT THE GROVE

Facchina Construction of Florida, LLC ("FCF") was created by Mr. Facchina in October of 2007 to continue his general contracting business in Florida after he had suspended operations by Facchina-McGaughan.[71] Mr. Facchina is an expert with respect to concrete and has a sophisticated understanding of the construction issues on the projects undertaken by the Facchina Companies.[72] Mr. Facchina testified that concrete packages for construction in Florida could typically be procured in a range from five to eight different packages.[73] Mr. Facchina also testified that parceling out concrete work to various subcontractors is a common practice. He explained that Facchina-McGaughan had procured anywhere from five to eight different concrete packages for its condominium tower projects.[74] He also testified that it previously "broke up" the concrete packages for each of the three Brickell condominiums in various ways.[75] Mr. Facchina testified that in Maryland,

---

[71] JX-27 (PSA Exhibit G -- Form of Shop Lease (9320 W&W Industrial Road) - Schedule 2.5(a) Financial Statements Facchina Group of Companies) at p. 292; Trial Tr., Nov. 18, 2019, at 21-22, 28.

[72] Trial Tr., Nov. 20, 2019, at 52-53.

[73] Trial Tr., Nov. 18, 2019, at 35.

[74] *Id.* at 41.

[75] *Id.* at 42.

Northern Virginia, and Washington, D.C., FCCI regularly "broke up" concrete packages.[76]

McPherson testified that, as a matter of operational policy, FCF would not break up the concrete work under its general contracts, as had been done by Facchina-McGaughan.[77] The record shows that FCF consistently followed this policy of assigning the concrete work to a single subcontractor until the Grove project.[78]

Sometime in early 2012, Jesus Vazquez approached Mr. Facchina for permission to pursue construction of the Grove, a proposed new condominium project.[79] The Grove project was more complex because its geometry was so unconventional.[80] The twisting concrete floors of the condo towers were supported by a "big steel structure in the core of the building that was very unusual."[81] As such, this was Mr. Facchina's companies' first time working on a project with this

---

[76] *Id.* at 54-55.

[77] Trial Tr., Nov. 20, 2019, at 69-70.

[78] JX-299 (Schedule 2.12(b)) at 8, 31 (Phase I), 33 (Phase II); JX-307 (Agreement Between Coral Gables and FCF) at 5; JX-27 at 542.

[79] Trial Tr., Nov. 18, 2019, at 29.

[80] Trial Tr., Nov. 20, 2019, at 69-70 ("Q. And do you know that the Grove at Grand Bay has that somewhat unique twisting aspect to it? A. It's got a geometry feature to it. That's all.").

[81] Trial Tr., Nov. 20, 2019, at 80.

twisting geometry.[82] Mr. Facchina's approval to take on Grove had been given on the express condition that the concrete work would not be broken up.[83] Indeed, both Mr. Facchina and McPherson expressly instructed Vazquez not to break up the concrete portion of the contract work on the Grove project.[84]

FCF and Terra entered into a contract on January 24, 2013, under which FCF agreed to build the Grove under a GMP contract.[85] Mr. Facchina's consent was required for Vazquez to execute this contract.[86] Mr. Facchina reviewed the estimates and made many comments about the structure.[87] The steel and concrete portions of the structure were with Mr. Facchina's area of expertise.[88] Mr. Facchina approved the GMP Amendment, in part, because it included "a conditional bond," which gave him "great comfort."[89]

---

[82] Trial Tr., Nov. 19, 2019, at 21.

[83] Trial Tr. Nov. 19, 2019, at 9; Trial Tr. Nov. 20, 2019, at 71. Mr. Facchina's sworn deposition testimony echoed this fact; he testified that, regarding the concrete work for the Grove, he told Vazquez "you buy one package, one package, not multiple, one . . . to perform the concrete portion of the contract." Mr. Facchina Dep., Oct. 5, 2018, at 63.

[84] Trial Tr., Nov. 20, 2019, at 68.

[85] JX-15 (Terra and FCF Agreement).

[86] Trial Tr., Nov. 20, 2019, at 81.

[87] JX-100 (Emails Between Charles McPherson and Les Nicholson March 4, 2016) at 3.

[88] Trial Tr., Nov. 20, 2019, at 79-80.

[89] Trial Tr., Nov. 18, 2019, at 32; JX-302 (Facchina Construction of Florida Guaranteed Maximum Price for the Grove) at 138–41.

The description of the concrete packages in the GMP amendment matches the breakdown in JX-17 (GMP spreadsheet), in terms of the work to be done and the "Final Bought Prices" for each package.[90] The prices in the Capform, C+C, and Titon subcontracts in the record exactly match the "Final Bought Prices" shown in the GMP amendment to the Grove contract.[91] When Mr. Facchina reviewed and approved the GMP amendment, ICA Tech/Empresas allege that he knew, at least by then, that the concrete portion of the work had been awarded to separate contractors because at the Facchina Companies, the word "Bought" meant awarded to a separate contractor, *i.e.*, the package is procured.[92]

Mr. Facchina testified that he was generally aware that there were forty to fifty different subcontractors working at the Grove, but that he was not familiar with the details regarding the subcontractors or subcontracts.[93] Mr. Facchina testified that he was unaware of the number of concrete packages awarded by Vazquez and did not participate in procuring them.[94] After the closing, around mid-2015, Mr. Facchina

---

[90] JX-302 at 4-5.

[91] JX-119 (Subcontract Agreement for Concrete Formwork at the Grove) at 4; JX-23 (Subcontract Agreement for Concrete Pump: Place and Finish Work at the Grove) at 4; JX-28 (Subcontract Agreement between FCCI and Titon) at 31, 127; JX-302 at 4.

[92] Trial Tr., Nov. 18, 2019, at 38.

[93] *Id.* at 43.

[94] *Id.* at 56.

heard for the first time that Vazquez retained more than one concrete subcontractor for the Grove, but he did not know the extent to which the concrete packages were separated.[95]

In reviewing the Grove concrete subcontracts during the pendency of this litigation, Mr. Facchina found that the FCF procurement team followed his initial advice by procuring fewer concrete packages.[96] Mr. Facchina explained at trial that the procurement team did a "masterful" job for awarding only three concrete subcontracts, which was fewer than there had been awarded in previous FCF and Facchina-McGaughan projects that were comparable to the Grove.[97]

In connection with the potential purchase of the Facchina Companies, ICA Tech/Empresas conducted exhaustive due diligence that occurred over approximately two years.[98] During the due diligence process with ICA Tech/Empresas, Mr. Facchina witnessed ICA Tech/Empresas representatives visit FCCI's home office in La Plata, Maryland.[99] He also directed McPherson to provide

---

[95] *Id.* at 58-59.

[96] *Id.* at 50-51, 54; Trial Tr., Nov. 19, 2019, at 164-65.

[97] Trial Tr., Nov. 18, 2019, at 50-51, 54; Trial Tr., Nov. 19, 2019, 164-65.

[98] Trial Tr., Nov. 20, 2019, at 133-34; Trial Tr., Nov. 21, 2019, at 189.

[99] Trial Tr., Nov. 18, 2019, at 95-96.

any and all information to them.[100] McPherson (who was Sellers' due diligence point person) testified that there were several layers of ICA Tech/Empresas due diligence, including business, legal, and accounting.[101] He testified that any requested information was provided to ICA Tech/Empresas[102] and that nothing was held back.[103]

As part of the due diligence process and during the approximately sixteen months from January of 2013 until closing on the purchase in April of 2014, sellers uploaded voluminous document electronically into a data room that were available to be viewed by the buyers and their representatives.[104] Rodrigo Quintana ("R. Quintana"), ICA Tech/Empresas' former general counsel and its current Chief Financial Officer, testified that at least twenty people working on ICA Tech/Empresas's behalf had access to the data room.[105] He explained that ICA Tech/Empresas had legal, accounting, business, and outside specialists conducting

---

[100] *Id.* at 95-96, 100.

[101] Trial Tr., Nov. 20, 2019, at 134.

[102] *Id.*

[103] *Id.* at 136, 188.

[104] PTO at ¶ 43.

[105] Trial Tr., Nov. 21, 2019 at 173.

its due diligence.[106] McPherson, who supervised the data room, directed his team to place the required documents into the data room.[107] He also directed his team to place all information required into the contract schedules attached to the PSA.[108]

Jennifer Wade Carpenter, a member of McPherson's team and former FCCI employee, testified via deposition that she was charged with gathering FCCI's contracts, preparing the contract schedules to the PSA, and uploading documents, both from FCF and FCCI, into the data room.[109] The Grove subcontracts for Capform, C&C and Titon, were placed in the data room in July 2013, nearly nine months before closing.[110]

All concrete subcontractors were identified in the PSA's contract schedules.[111] Quintana admitted that he does not know whether anyone on behalf of ICA Tech/Empresas even looked for the concrete subcontracts in the data room.[112]

---

[106] *Id.* at 157.

[107] Trial Tr., Nov. 20, 2019, at 136.

[108] *Id.* at 137-38.

[109] Trial Deposition of Jennifer Wade Carpenter ("Carpenter Dep."), Oct. 30, 2019, at 24-25, 38-39 (D.I. 143).

[110] JX-279 (Screenshot of Database C&C folder); JX-281 (Screenshot of Database Capform folder); JX-297 (Screenshot of Database Titon folder).

[111] JX-299 (Schedule 2.12(b) Material Contracts) at 36, 61, 62; Trial Tr., Nov. 21, 2019, at 203.

[112] Trial Tr., Nov. 21, 2019, at 174-75.

Quintana admitted that he does not know whether anyone even asked questions about the Grove contract even though the operations of FCF were "very important" to ICA Tech/Empresas.[113] Mr. Facchina had no role in preparing or reviewing any of the contract schedules attached to the PSA.[114] And he never directed anyone to withhold any information from the data room or lto eave any information out of the PSA's schedules.[115]

After ICA Tech's purchase of the Facchina Companies, Mr. Facchina was named Chairman of FCCI's Board of Directors.[116] The board's members were Mr. Facchina, Alonso Quintana, and Ruben Lopez.[117] As Mr. Facchina understood it, Alonso Quintana was ICA Tech's Chief Executive Officer and Ruben Lopez was its Chief Operating Officer.[118] FCCI's officers were McPherson, Chief Executive Officer, Paul Kravic, Chief Financial Officer, and Jesus Vazquez, Chief Operating

---

[113] Trial Tr., Nov. 18, 2019, at 98-99; Trial Tr., Nov. 21, 2019, at 192-93; Carpenter Dep. at 31, Oct. 30, 2019, at 46.

[114] Trial Tr., Nov. 18, 2019, at 99.

[115] Trial Tr., Nov. 18, 2019, at 100; Trial Tr., Nov. 20, 2019, at 137-38; Trial Tr., Nov. 21, 2019, at 188.

[116] Trial Tr., Nov. 18, 2019, at 105.

[117] JX-52 (FCCI Board of Directors Meeting Minutes June 20, 2014); Trial Tr., Nov. 18, 2019, at 106.

[118] JX-52; Trial Tr., Nov. 18, 2019 at 107.

Officer.[119] An executive committee was then formed to oversee day-to-day company operations.[120] The executive committee was composed of McPherson, Vazquez, Antonio Sordo and Rafael Rodriguez.[121] Antonio Sordo and Rafael Rodriguez were both officers of ICA Tech/Empresas. Mr. Facchina was not a member of the executive committee.[122] R. Quintana acknowledged that it was the executive committee that ran all FCCI operations post-closing and provided strategic advice.[123]

McPherson testified that after the sale, FCCI and ICA Tech/Empresas began to face a multitude of financial challenges and operational difficulties, only some of which related to the Grove.[124]

During 2015, the project architect began to identify defects with the concrete work that resulted in FCF not being paid on a monthly basis. This caused serious cash flow problems for FCF. The defects were not being corrected by the concrete subcontractors because of disputes among them and with FCF as to who was

---

[119] JX- 52; Trial Tr., Nov. 18, 2019 at 108-09.

[120] JX-52; Trial Tr., Nov. 18, 2019, at 105; Trial Tr., Nov. 21, 2019, at 155.

[121] Trial Tr., Nov. 18, 2019, at 110.

[122] *Id.*; Trial Tr., Nov. 20, 2019, at 147-48; Trial Tr., Nov. 21, 2019, at 179-80.

[123] Trial Tr., Nov. 21, 2019 at 155.

[124] Trial Tr., Nov. 20, 2019 at 172-76, 215-16.

responsible. FCF incurred substantial expenses bringing in additional labor and contractors to correct the defects. There were claims that breaking up the work among the various subcontractors had resulted in gaps between the scope of work for the various subcontractors and the overall scope of FCF's responsibility. Ultimately, both Capform and C&C were placed in default by FCF.[125]

According to McPherson, the multitude of financial challenges and operational difficulties related to the Grove only manifested themselves as the Grove progressed.[126] The Grove had a gross profit of $1,697,160 as of December 31, 2014.[127] On April 9, 2015, McPherson and FCCI's Chief Financial Officer, Kravic, sent a letter to Deloitte identifying, among other things, certain issues and concerns facing the Grove.[128] The letter does not mention any problems caused by or relating to having three concrete subcontractors at the Grove.[129]

McPherson acknowledged that the letter does identify a 46-day delay in construction caused by the Grove's steel subcontractor, SteelFab. McPherson

---

[125] Trial Tr., Nov. 21, 2019, at 30-35; JX-81 (Capform Incorporated Default SDI Claim, December 31, 2015) and JX-82 (C&C Concrete Pumping Default SDI Claim, December 31, 2015).

[126] Trial Tr., Nov. 20, 2019, at 144.

[127] JX-65 (FCCI Board of Directors Meeting May 15, 2015) at 85; Trial Tr., Nov. 18, 2019, at 115.

[128] JX-65 at 96; Trial Tr., Nov. 18, 2019, at 117.

[129] JX-65 at 96; Trial Tr., Nov. 18, 2019, at 117.

admitted that because of that that delay other subcontractors asserted claims against FCF.[130] FCF paid SteelFab $1,000,000 in order to resolve that dispute.[131]

In addition, in a letter dated April 9, 2015, Deloitte raised concerns regarding FCCI's lack of internal controls. Deloitte wrote, "We have identified, and included in Appendix B, certain matters involving the Company's internal control over financial reporting that we consider to be a significant deficiency under standards established by the American Institute of Certified Public Accountants."[132] These deficiencies included lack of journal entry documentation (account reconciliations and estimates) and information technology controls. McPherson and Les Nicholson, FCCI's former in-house counsel and ICA Tech/Empresas' paid consultant in this matter, both testified that in or about August, 2015, a new project executive, the fourth such person, who is the individual tasked with overseeing an entire project, was assigned to the Grove.[133]

McPherson admitted that after the closing, he had made a poor financial deal

---

[130] JX-65 at 96; Trial Tr., Nov. 20, 2019, at 149-50.

[131] JX-79 (FCCI Consolidated Financial Statements as of December 31, 2015") at 38; Trial Tr., Nov. 20, 2019, at 151-52; see also JX-113 (Emails Between Charles McPherson, Les Nicholson, and Jesus Vazquez, March 18, 2016).

[132] JX-65 at 89; Trial Tr., Nov. 18, 2019, at 118-19.

[133] JX-75 (FCCI Board of Directors Meeting, December 11, 2015) at 6; Trial Tr., Nov. 18, 2019, at 120-23; Trial Tr., Nov. 20, 2019, at 158-59 (McPherson: "That's a lot. And it's not good."); Trial Tr., Nov. 21, 2019, at 56.

with Terra based on incorrect information he received from FCF regarding the Grove's schedule.[134]

As of November 30, 2015, FCCI's financial statements, as presented at a December 11, 2015 FCCI board meeting, anticipated a profit in excess of $3 million for the Grove.[135] Those same financial statements reveal that FCCI anticipated a $6,889,000 cash recovery for back charges from contractor default insurance for C&C, Capform, and Steelfab.[136] After the December 11, 2015 board meeting, it is undisputed no other board meetings occurred for approximately nine months.[137]

The December 31, 2015 financial statements identify disputes between FCCI and Steelfab, GM&P, C&C and Capform.[138] GM&P, like Steelfab, was not a Grove concrete subcontractor.[139] McPherson confirmed that on December 31, 2015, FCF submitted a subcontractor default insurance ("SDI") claim related to Capform.[140]

The amount of that claim was $5,456,678 and related to poor workmanship,

---

[134] JX-75 at 6; Trial Tr., Nov. 20, 2019, at 159-63.

[135] JX-75 at 10; Trial Tr., Nov. 18, 2019, at 125-26.

[136] JX-75 at 11; Trial Tr., Nov. 18, 2019, at 126-27.

[137] JX-165; JX- 166 ("FCCI Board of Directors Meeting, September 26, 2016"); Trial Tr., Nov. 18, 2019, at 140-41.

[138] JX-79 at 38-39; Trial Tr., Nov. 18, 2019, at 130-31.

[139] Trial Tr., Nov. 18, 2019, at 131.

[140] JX-81; Trial Tr., Nov. 20, 2019, at 164-65.

not work coordination.[141] "The work that was rejected, included, but was not limited to, defective concrete finishes, work outside of acceptable tolerances, incorrect form layout and defective window wall and shower pan depressions."[142] McPherson also confirmed that on December 31, 2015, FCF submitted a subcontractor default insurance ("SDI") claim related to C&C.[143]

The amount of that claim was $863,000 and, again, related to poor workmanship, not work coordination.[144] The workmanship issues included "defective window wall depressions, incorrect balcony edge thicknesses, improper vibration/finishing/consolidation and defective shower pan depressions."[145] Nicholson testified that he prepared the aforesaid insurance claims on FCCI's behalf.[146]

On March 4, 2016, McPherson wrote an email to ICA Tech's Rodrigo Quintana identifying "serious cash issues" facing FCCI.[147] When shown this email,

---

[141] JX-81 at 11.

[142] JX- 81 at 7.

[143] JX-82; Trial Tr., Nov. 20, 2019, at 165.

[144] JX-82 at 8.

[145] JX-82 at 6.

[146] Trial Tr., Nov. 21, 2019, at 54.

[147] JX-100 at 5.

McPherson testified that these significant cash flow issues were caused by a $5 million loss on a National Park Service job, a $4,352,491 earnout payment, and a $6 million investment that was supposed to be reimbursed to FCCI from ICA Tech but never was.[148]

It is undisputed that the June 30, 2016 unaudited internally generated FCCI financial documents indicate an anticipated loss of approximately $3,750,000 at completion of the $135 million Grove.[149] ICA Tech/Empresas did not prove that this alleged loss was a result of the awarding of the concrete subcontracts.

When shown the above financial documents, McPherson acknowledged that they also indicate an approximate $55 million company-wide decrease in revenues between the years 2015 and 2016.[150] McPherson testified that between the years 2015 and 2016 site work was down fifty-three percent and heavy construction was down thirty-nine percent.[151]

Nicholson testified that FCCI did not prepare audited financial statements for the year 2016.[152] On August 12, 2016, more than two years after closing, McPherson

---

[148] Trial Tr., Nov. 20, 2019, at 173-77.

[149] JX-139 (FCCI Internal Financial Reports, June 2016); Trial Tr., Nov. 18, 2019, at 135-37.

[150] JX-139 at 4; Trial Tr., Nov. 18, 2019, at 137-38; Trial Tr., Nov. 20, 2019, at 172.

[151] Trial Tr., Nov. 20, 2019, at 173.

[152] Trial Tr., Nov. 21, 2019, at 61.

wrote an e-mail explaining issues with the Grove at Grand Bay to Dolores Laputka, Esquire, Mr. Facchina's counsel, and copied, among others, Mr. Facchina.[153]

When shown this email, McPherson testified that the largest issue facing FCCI post-purchase was that the Grove schedule could not be maintained.[154] McPherson testified that he learned of the improper schedule in late 2015 or early 2016.[155]

Nicholson testified that FCF was responsible for the project schedule.[156] McPherson testified that the second largest issue facing FCCI post-purchase was the lack of civil work in Maryland, which had nothing at all to do with the Grove.[157] McPherson testified that third largest issue facing FCCI post-purchase was its excessive amount of overhead, which was caused by the increase in the number of individuals FCCI had to retain in order to transition from a private company to a public one.[158] McPherson testified that the Grove may have turned out to be a bad

---

[153] JX-145 (Email Between Charles McPherson and Dolores Laputka, August 12, 2016); Trial Tr., Nov. 18, 2019, at 149-50; 152-56.

[154] Trial Tr., Nov. 20, 2019, at 144; *see also* JX-113 at 1.

[155] Trial Tr., Nov. 20, 2019, at 157.

[156] Trial Tr., Nov. 21, 2019, at 53.

[157] Trial Tr., Nov. 20, 2019, at 145.

[158] Trial Tr., Nov. 20, 2019, at 146, 155-56.

business decision, but that is all.[159] At trial, McPherson also confirmed his deposition testimony where he unequivocally stated that there was no fraud.[160]

Additionally, in mid-2015, Empresas defaulted on a more than a billion-dollar bond.[161] Shortly after this massive default, Travelers refused to issue surety bonds to FCCI.[162] Charles Langfitt, Travelers' corporate representative, testified that Travelers issued a credit freeze because of ICA Tech/Empresas's downgrade on Moody's credit rating system.[163] Lack of surety support is a death knell for a construction company because without it one cannot work on larger, bonded projects.[164] And, McPherson testified, surety work was FCCI's "bread and butter."[165]

At trial, Nicholson agreed: "The loss of Travelers as its surety company going forward posed a serious threat to FCCI's ability to remain in business unless a replacement surety company could be promptly obtained."[166] After the Empresas

---

[159] *Id.* at 144-45.

[160] *Id.*

[161] *Id.* at 131-32.

[162] Trial Tr., Nov. 21, 2019, at 44.

[163] *Id.* at 92.

[164] Trial Tr., Nov. 18, 2019, at 133-34; Trial Tr., Nov. 20, 2019, at 169-70.

[165] Trial Tr., Nov. 20, 2019, at 170.

[166] Trial Tr., Nov. 21, 2019, at 44.

billion-dollar bond default, Mr. Facchina learned that there were "massive" changes made at ICA Tech/Empresas's senior level.[167] And it wasn't until five to six months after Travelers refused to provide surety support, that FCCI found a surety willing to provide it with bonding support, Berkshire Hathaway Specialty Insurance Group.[168]

## IV. GENERAL LEGAL PRINCIPLES

Though the Court sits without a jury, it has applied the same principles of law in its deliberations and consideration of each individual claim and counterclaim that it would have more formally instructed a jury to follow. The Court may highlight here some of those that are most applicable to this particular case. But the fact that some particular point or concept may be mentioned here should not be regarded as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and the parties claims and counterclaims.

In reaching its verdict the Court has examined the joint exhibits submitted and considered the testimony of all witnesses, both direct and cross. The Court has also considered the applicable Delaware case law that has defined the legal precepts applicable here. The Court has applied the Delaware Rules of Evidence to the

---

[167] JX-130 (Emails Between FCCI Executives and Staff, June 16, 2016) at 2; Trial Tr., Nov. 18, 2019, at 148-49.

[168] JX-102 (Emails Between FCCI and Berkshire Hathaway, March 12, 2016).

testimony and exhibits and only used for its deliberation that which would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial, during the trial proceedings, and post-trial. And, of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

The Court then reviewed and applied the very instructions that it would give a jury in these circumstances.[169]

In this particular case, FCCI carries the burden of proof by a preponderance[170] of the evidence on Counts I, II and III of its Complaint; Mr. Facchina on Counts I, V, and VI of his Complaint;[171] and ICA Tech/Empresas on Counterclaims I and II.

## V. FINDINGS AND VERDICT

At trial there were three central contentions to be resolved: (1) whether there was fraud in the form of concealment of risks concerning the Grove at Grand Bay

---

[169] *See, e.g.,* Super. Ct. Civil Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[170] *See e.g., Reynolds v. Reynolds,* 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *Oberly v. Howard Hughes Medical Inst.,* 472 A.2d 366, 390 (Del. Ch. 1984) (same).

[171] Counts II-IV of Seller Representative's Complaint were voluntarily dismissed on August 30, 2019. *See* Order Denying All Motions for Summary Judgment, Dismissing Certain Claims, and Striking Certain Affirmative Defenses.

condominium project in Miami; (2) whether indemnification was required under the terms of the PSA, including entitlement to $3.5 million held in escrow; and (3) whether acceleration of an earn-out payment was due under the terms of the PSA.

## A. THE COURT FINDS FOR MR. FACCHINA ON THE FRAUD COUNTERCLAIMS.

The Court first addresses the primary issue of whether the representations and warranties made by Mr. Facchina as Seller Representative under PSA Sections 2.6 and 2.29 were intentionally false and misleading, thereby entitling the Purchaser to recover for fraud under PSA Section 9.5(c). Under Delaware law, a claim of common law or legal fraud requires the plaintiff to prove each of the following: "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."[172]

To recover on a claim of equitable fraud, the plaintiff must satisfy all the elements of common-law fraud with the exception that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.

---

[172] *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citation omitted).

So, to succeed on that claim, the plaintiff must prove each of the following: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant intended to induce the plaintiff to act or refrain from acting; (3) the plaintiff acted in justifiable reliance on the representation; and (4) the plaintiff was injured by its reliance.[173]

One is equally culpable of fraud when he by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading.[174]

ICA Tech/Empresas alleges: that "breaking up" the Grove concrete work created enormous risks to FCCI; and, that Vazquez deliberately disobeyed an instruction given by Mr. Facchina not to "break up" the concrete. ICA Tech/Empresas claims that the aforesaid information was known by Mr. Facchina before closing and concealed from ICA Tech/Empresas.[175] ICA Tech/Empresas must prove by a preponderance of the evidence that: (1) Mr. Facchina made a false representation; (2) Mr. Facchina knew the representation was untrue or made the statement with reckless indifference to the truth; (3) Mr. Facchina intended for ICA

---

[173] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del. 1996).

[174] *See Lock v. Schreppler*, 426 A.2d 856, 860–61 (Del. Super. Ct. 1981) (concealment of material facts); *Leech v. Husbands*, 152 A. 729, 731-32 (Del. Super. Ct. 1930) (same).

[175] PTO at ¶¶ 6-7.

Tech/Empresas to rely on the representation; (4) ICA Tech/Empresas justifiably relied on the representation; and (5) ICA Tech/Empresas suffered causally related damages.[176] Resolution of this claim depends, in part, on the Court's assessment of the credibility of Mr. Facchina and McPherson as witnesses, evaluation of the documentary evidence, and derivation of reasonable inferences from the direct and circumstantial evidence.

The Court finds no credible evidence that Mr. Facchina knew before the closing that Vasquez had awarded the Grove concrete packages to more than one subcontractor. Mr. Facchina and McPherson only learned that Vazquez had awarded concrete packages to more than one subcontractor after the closing of the sale of the Facchina Companies to ICA Tech, which occurred on April 14, 2014.[177] McPherson, the post-sale CEO and President of FCCI, credibly testified that both he and Mr. Facchina learned this information "well after" the sale.[178]

In fact, there is no evidence that Vazquez did not follow Mr. Facchina's instructions regarding the concrete work at the Grove. As for his conversation with McPherson and Vazquez about the Grove, Mr. Facchina testified that he advised Vazquez and McPherson to "make it easy" on themselves by purchasing concrete

---

[176] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 807 (Del. Ch. 2014).

[177] *See* Trial Tr., Nov. 18, 2019, at 58-59.

[178] Trial Tr., Nov. 20, 2019, at 142.

packages in "chunks", *i.e.*, the fewer packages, the better.[179] As Mr. Facchina explained, the fewer concrete packages purchased simply meant that the general contractor, FCF in this case, had fewer concrete contractors to manage and coordinate.[180] McPherson testified that it was his understanding that the above advice was an instruction.[181]

Vazquez, the former President of FCF, and the individual who procured the concrete subcontractors for the Grove, did not testify at trial despite the fact that: (a) he previously submitted an Affidavit on behalf of ICA Tech/Empresas in response to Mr. Facchina's Motion for Partial Summary Judgment Regarding Fraud; (b) he was the third person involved in the conversation regarding plans for concrete subcontracting at the Grove and the only one with personal knowledge of his understanding of Mr. Facchina's comments; and (c) he is the individual best-situated to explain his intention to comport with Mr. Facchina's advice. Yet, ICA Tech/Empresas chose not to call Vazquez. So there is no evidence of record as to how Vazquez interpreted the aforesaid conversation or sought to follow the recommendations. Indeed, given the other record evidence the inference properly drawn is that Vazquez would confirm Mr. Facchina's testimony that his statements

---

[179] Trial Tr., Nov. 18, 2019, at 34-36, 58.

[180] Trial Tr., Nov. 19, 2019, at 28-29.

[181] Trial Tr., Nov. 20, 2019, 68-69.

-41-

were recommendations or advice and that Vazquez believed that he followed Mr. Facchina's recommendations or advice.

Of greater import, however, is that the evidence does not show that the Grove concrete subcontracts were "broken up" in a manner to cause concern. For instance, the most complicated work and the work Mr. Facchina would have found most concerning resided with a single concrete subcontractor, Titon. Mr. Facchina testified as follows: "My expectation in Grove is that that they would make their life easier on them, take the easy way out, make it simpler, one-stop shop. That was my expectation. And they did exactly that and exceeded my expectation."[182]

ICA Tech/Empresas has not demonstrated that Mr. Facchina misrepresented or did not disclose information with the intent to induce it to purchase FCCI. Again, it is undisputed that sometime after the closing of the sale of the Facchina Companies to ICA Tech, which occurred on April 14, 2014, Mr. Facchina and McPherson learned that Vazquez awarded concrete packages for the Grove to more than one subcontractor.[183] Rodrigo Quintana, ICA Tech/Empresas's former general counsel and its current Chief Financial Officer, admitted that ICA Tech/Empresas was particularly interested in FCF's vertical construction experience with residential

---

[182] Trial Tr., Nov. 19, 2019, at 16-17.

[183] Trial Tr., Nov. 18, 2019, at 58-59; Trial Tr., Nov. 20, 2019, at 142.

-42-

condominiums.[184] Quintana testified that ICA Tech/Empresas personnel specifically visited various construction sites, including those in Florida, visited FCF's offices in Miami, Florida, and reviewed the Grove contract.[185]

As for information particular to the Grove, Mr. Facchina never withheld any information from the purchasers regarding it.[186] It is undisputed that Mr. Facchina did not have access to the data room and had no role in preparing the contract schedules attached to the PSA, which identify the Grove subcontractors and contracts.[187] The only evidence of any construction concern raised by Mr. Facchina about the Grove is contained in an email sent to Vazquez more than two months before the closing.[188] That concern, which involved thermal contraction and expansion, was addressed by DeSimone, the architect and engineer of record, and considered resolved in February 2014, more than two months before closing.[189]

---

[184] Trial Tr., Nov. 21, 2019, at 176.

[185] Trial Tr., Nov. 20, 2019, at 134-35; Trial Tr., Nov. 21, 2019, at 175-76.

[186] Trial Tr., Nov. 18, 2019, at 100.

[187] Id. at 98-99, 100; Trial Tr., Nov. 20, 2019, at 137-138; Trial Tr., Nov. 21, 2019, at 188, 192-93; Carpenter Dep. at 31, 46.

[188] JX-37 (Emails Between Mr. Facchina and Jesus Vazquez, February 3, 2014); Trial Tr., Nov. 18, 2019, at 102-04.

[189] Trial Tr., Nov. 18, 2019, at 102-104.

In summary, the Court finds: *first,* there is no evidence that Mr. Facchina knew before closing how Vazquez had awarded the Grove concrete packages; *second,* there is no evidence that Vazquez broke up those packages in any way inconsistent with Mr. Facchina's expectations; and, *third,* there is no evidence that Vazquez broke up those packages in any way materially detrimental to the Grove as a whole. Moreover, ICA Tech/Empresas has failed to prove its actual reliance on any false statement or any omissions made by Mr. Facchina. The trial evidence convincingly demonstates that ICA Tech/Empresas had complete access to FCCI's information and personnel.[190] There is also no evidence that ICA Tech/Empresas suffered any losses on the Grove proximately caused by the fraud it alleges here.

## B. THE COURT FINDS FOR MR. FACCHINA ON THE INDEMNIFICATION CLAIMS.

The Court next addresses whether the Sellers are in breach of the PSA as a result of their refusal to indemnify FCCI. Under Delaware law, to prevail on a breach-of-contract count, a plaintiff must show: "(1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages."[191] The Court determines the parties' rights and obligations from the clear, unambiguous terms of the PSA. Under Delaware law, "[w]hen the contract is clear and unambiguous, [Delaware courts]

---

[190] Trial Tr., Nov. 21, 2019, at 173.

[191] *Cornell Glasgow, LLC v. LaGrange Props., LLC,* 2012 WL 6840625, at *14 (Del. Super. Ct. 2012) (citing *H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 144 (Del. Ch. 2003)).

give effect to the plain meaning of the contract's terms and provisions."[192] Delaware courts "'adhere[] to the objective theory of contracts.'"[193] The objective theory of contracts "requires a court to interpret a particular contractual term to mean 'what a reasonable person in the position of the parties would have thought it meant.'"[194] Delaware courts "'will read the contract as a whole and [] will give each provision and term effect[.]'"[195]

Now "[t]he parties' disagreement as to the meaning of the contract does not render it ambiguous."[196] Rather, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible to different reasonable interpretations."[197] In contrast, a contract is unambiguous "where the court can determine the meaning of a contract 'without any other guide than a knowledge of

---

[192] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

[193] *Vinton v. Grayson*, 189 A.3d 695, 704 (Del. Super. Ct. 2018) (quoting *Osborn*, 991 A.2d at 1159).

[194] *Id.* at 704 (quoting *Lorillard Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 740 (Del. 2006)).

[195] *Id.* (quoting *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[196] *Catawba Assoc.-Christiana LLC v. Jayaraman*, 2016 WL 4502306, at *6 (Del. Super. Ct. Aug. 26, 2016); *see also Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

[197] *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1062 (Del. 2010).

the simple facts on which, from the nature of language in general, its meaning depends.'"[198]

Sellers have never suggested that any provision of the PSA is ambiguous. And the Court's own examination of the controlling PSA provisions reveal no ambiguity. So the Court may determine the parties' rights and obligations without relying on extrinsic evidence or anything more than the plain, ordinary meaning of the PSA's words.[199]

Section 9.9 of the PSA states the following:

> **9.9 Settlement or Compromise.** Any settlement or compromise made or caused to be made by the Indemnified Person or the Indemnifying Person, as the case may be, of any such claim, suit, action or proceeding of the kind referred to in Section 9.8 shall also be binding upon the Indemnifying Person or the Indemnified Person, as the case may be, in the same manner as if a final judgment or decree had been entered by a court of competent jurisdiction in the amount of such settlement or compromise; *provided, that* . . . (ii) the Indemnified Person shall not compromise or settle any claim, suit, action or proceeding without the prior written consent of the Indemnifying Person, which consent shall not be unreasonably withheld.[200]

---

[198] *Rhone-Poulenc*, 616 A.2d at 1196 (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. Ct. 1983)).

[199] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[200] PSA § 9.9 (emphasis added).

Section 9.8 of the PSA addresses the obligation to notify an "Indemnifying Person" of a third-party claim.[201] "[T]he kind referred to in Section 9.8" includes indemnification sought pursuant to Sections 9.2, 9.3 or 9.4. Section 9.2 of the PSA further provides that "Each Seller, jointly and severally, agrees to indemnify . . . each of the Purchaser Indemnified Parties against, and agrees to hold each of them harmless from, any and all Losses incurred or suffered by them relating to or arising out of . . . the Silver Spring Matter."[202] Section 9.2 is also explicitly subject to the limitations of Article IX.[203]

Under the plain language of the PSA, the Indemnifying Person's consent is a condition precedent to FCCI being indemnified for any settlement or claim. Indeed, if the parties had wanted a violation of Section 9.9 to have an effect other than relief from indemnity obligations, they could have written Section 9.9 differently, but they did not. For example, Section 9.8 states "that the failure of the Indemnified Person to give notice [of a claim in which indemnity may be sought] shall not relieve the Indemnifying Person of its obligation under this Article IX except to the extent (if any) that the Indemnifying Person shall have been actually prejudiced thereby."[204]

---

[201] *Id.* at § 9.8.

[202] *Id.* at § 9.2.

[203] *Id.* at § 9.2.

[204] *Id.* at § 9.8.

Mr. Facchina—the Indemnifying Person—testified that he did not provide prior written consent or even oral consent to the SSTC lawsuit settlement nor was he asked for his consent to any of the settlement agreements.[205] After reviewing some invoices, Bastianelli recalled that he and Mr. Facchina only had two brief telephone conversations approximately two weeks before the MontCo/Foulger-Pratt settlement.[206] Although Mr. Facchina was copied on a handful of informational emails regarding settlement negotiations, it is undisputed that Mr. Facchina never once replied to these e-mails with his consent or opinion. Nor was he ever requested to do so.[207]

What's more, Bastianelli testified that he did not copy Mr. Facchina on several emails closer in time to the WMATA and MontCo/Foulger-Pratt final settlement discussions. Bastianelli testified that he did not negotiate the settlement with Mr. Facchina.[208] And Bastianelli did not seek Mr. Facchina's consent to those settlements because Mr. Facchina was not a decision maker.[209] Bastianelli testified that the two decision makers were Langfitt of Travelers and Don Asselin of

---

[205] Trial Tr., Nov. 18, 2019, at 181-183.

[206] Trial Tr., Nov. 20, 2019, at 47-48.

[207] Trial Tr., Nov. 18, 2019, at 181-183; JX-230; Tr. Trial Tr. Nov. 20, 2019, at 55.

[208] *Id.* at 62.

[209] Trial Tr., Nov. 20, 2019, at 60, 67; JX-232.

Zurich.[210]  And, Bastianelli testified that the individuals with decision making authority on behalf of FCCI were McPherson and Timothy Heffernan, Traveler's counsel and FCCI's counsel in the present matter.[211]

It is undisputed that FCCI executed the settlement agreements, FCCI was the named party in the SSTC lawsuit, and FCCI is seeking indemnification from Sellers based on the terms and conditions of the PSA.  It is also undisputed that Mr. Facchina did not consent to withdraw or release any of the aforementioned SSTC-related claims nor was he asked for his consent.[212]

Therefore, the existence of the condition precedent to any indemnification obligation was not proven at trial by a preponderance of the evidence.  And so, the Court rules in favor of Mr. Facchina on this claim brought by FCCI.

### C. THE COURT FINDS FOR ICA TECH/EMPRESAS ON THE CLAIMS CONCERNING ACCELERATION OF THE EARN-OUT PAYMENT UNDER THE PSA.

Lastly, this Court addresses the claims concerning acceleration of the earn-out payment under the PSA.  At issue is these claims is whether the actions of ICA Tech and/or FCCI constituted a sale of all or substantially all of the assets of the

---

[210] *Id.* at 56.

[211] *Id.* at 61.

[212] Trial Tr., Nov. 18, 2019, at 198.

-49-

Facchina Companies, taken as a whole, to a Third-Party Purchaser, as defined in Section 1.8(e) of the PSA.

### 1. *Mr. Facchina's Breach-of-Contract Claim*

Mr. Facchina alleges that ICA Tech breached the terms of the PSA in way that triggers Seller's contingent right to an acceleration payment under Section 1.8 (e). PSA § 1.8(e)(i) requires Seller to demonstrate a sale to a Third-Party Purchaser of:

> [A]ll or substantially all of the assets of the Companies, taken as a whole, or a business unit that includes all or substantially all of the business of the Companies, taken as a whole, in each case as they then currently exist (a "Sale Transaction") . . .[213]

The PSA language detailing the obligation to make the Acceleration Payment provides that after the predicate to Mr. Facchina's right to an Acceleration Payment is met, "Facchina Construction shall . . . make a payment to the Seller Representative on behalf of Sellers in the amount of the Acceleration Payment."[214]

Section 11.21 of the PSA does require Empresas, as parent guarantor, to guarantee Facchina Construction's obligation to make payments under the PSA.[215] But Empresas's guarantee obligation does not arise until FCCI is first found liable

---

[213] PSA §1.8(e)(i).

[214] *Id.* at § 1.8 (e)(i), p. 19.

[215] *Id.* at § 11.21, p. 96.

to make a payment.[216] Mr. Facchina did not show (1) that an Acceleration Payment is due; (2) that FCCI failed to make the required payment; or (3) that FCCI's failure to make any such payment is a breach of the PSA.

The fact is that Mr. Facchina has never asked Facchina Construction Company to make an Acceleration Payment because he does not allege that the Facchina Companies did anything to harm him.[217]

Mr. Facchina disavowed having any claim against FCCI for an acceleration payment, and there is no basis for any claim by against Empresas under its guarantee. Accordingly, Empresas has no corresponding obligation to ensure a payment is made.

---

[216] *Id.*

[217] Mr. Facchina, himself, has always been consistent on this point:

> Q. Did Facchina Construction Company breach the PSA?
>
> A. My complaints are not with Facchina Construction Company. They are with ICA.
>
> Q. So if Facchina Construction Company isn't in breach, what you were just referring to is ICA?
>
> A. That's what I'm referring to, because my deal is with ICA, not Facchina Construction.
>
> . . .
>
> Q. I'm just clarifying to make sure that here in this affirmative defense you're not suggesting that Facchina Construction Company is in breach of the PSA.
>
> A. No, I'm not.

Mr. Facchina Dep. at p. 12 (intervening objections omitted).

Mr. Facchina has also failed to prove by a preponderance of the evidence that that a triggering "Sale Transaction"—*i.e.* a sale to a third-party purchaser of "all or substantially all" of the Company's assets—occurred. And his cited cases do not truly assist him in shouldering this burden.

In *Gimbel v. Signal Companies, Inc.*, the trial court interpreted a statute and found the subject stock sale did *not* constitute a sale of "all or substantially all" of the company's assets.[218] Of particular note, the *Gimbel* court had an opportunity to closely examine expert testimony and valuations of the alleged assets in making its determination. Here, however, Sellers fail to supply even the basic evidence that would allow this Court to make a determination in its favor.[219]

Likewise, the application of *Hollinger Inc. v. Hollinger Int'l, Inc.* is limited to the same statute in at issue in *Gimbel*—8 *Del. C.* § 271—and again the court ultimately found the sale did *not* constitute "all or substantially all" of the company's assets.[220] Despite the "contextual approach" advocated by Sellers, the *Hollinger* court made it clear such approach will not permit a finding that "all or substantially all" of a company's assets were sold unless the plaintiff meets the minimum

---

[218] 316 A.2d 599, 606-08 (Del. Ch. 1974) (holding that a sale of less than 50% of the assets is not "all or substantially all").

[219] *Compare id.* at 607–608.

[220] 858 A.2d 342, 385 (Del. Ch. 2004).

requirement of showing that at least half of the assets were sold.[221] Mr. Facchina has not satisfied this minimum requirement.

## 2. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Under Delaware law, in order to recover for breach of the implied covenant of good faith and fair dealing, the Seller must prove that ICA Tech acted arbitrarily or unreasonably—effectively preventing Plaintiff from receiving the benefit of the bargain. "A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[222]

Mr. Facchina has not proven by a preponderance of the evidence that ICA Tech acted arbitrarily or unreasonably. ICA Tech has no obligation to the Sellers regarding the Acceleration Payment. And because FCCI never became obligated to make the Aceleration Payment, Empresas was never obligated to make any such payment.

---

[221] *Id.* at 386.

[222] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

# VI. VERDICT AND JUDGMENT

## A. On FCCI's Complaint:

- <u>Count I – Breach of Contract</u>:  For Mr. Facchina

- <u>Count II – Attorneys' Fees</u>: For Mr. Facchina

- <u>Count III – Declaratory Judgment</u>: For Mr. Facchina

## B. On Mr. Facchina's Complaint:

- <u>Count I – Breach of Contract against ICA Tech</u>: For ICA Tech

- <u>Count V – Breach of Implied Covenant of Good Faith and Fair Dealing against ICA Tech and Empresas</u>: For ICA Tech and Empresas

- <u>Count VI – Enforcement of Guaranty against Empresas as the Parental Guarantor</u>: For Empresas

## C. On ICA Tech/Empresas's Amended Answer and Counterclaim:

- <u>Count I – Declaratory Judgment</u>: For Mr. Facchina

- <u>Count II – Fraud</u>: For Mr. Facchina

The parties shall confer and, within 15 days, submit to the Court a proposed form of Order of Final Judgment consistent with these findings and verdicts.

**IT IS SO ORDERED.**

_____
**Paul R. Wallace, Judge**

Original to Prothonotary
cc:  All counsel via File & Serve